## STATE EX REL. NATIONAL LIFE INSURANCE CO. v. JAY*
(No. 1463; October 17, 1927; 260 Pac. 180)

TAXATION—INSURANCE PREMIUM REFUNDED NOT TAXABLE—EVIDENCE —JUDICIAL NOTICE—MUTUAL LIFE INSURANCE COMPANIES—STAT-  UTES—STATUTORY CONSTRUCTION.

1. The tax imposed by Comp. St. 1920, § 2766, on insurance companies' transacting business within the state in accordance with their gross annual premiums, *held* not to apply to that part of the premiums refunded to policy holders of a mutual life insurance company under a participating plan.

2. On question of taxation assessed against insurance companies on their gross annual premiums, as provided by Comp. St. 1920, § 2766, the court could not take judicial notice of the practice of the various counties of the state, under former similar taxation law.

3. In construing a statute relative to the taxation of insurance companies placed on their gross annual premiums, the court could not take judicial notice on the question of tax assessable on premiums of mutual life insurance companies that such companies did business in the state at a stated period.

4. Where the construction of Comp. St. 1920, § 2766, relative to taxation of insurance premiums was being considered, *held*, that the construction placed on the superseded statute prior to 1921 was not controlling, where, since that time, construction by the Attorney Generals had been similar to construction placed on statute by the Supreme Court.

*See Headnotes: (1) 37 Cyc. p. 841 n. 48 New; (2-4) 23 C. J. p. 95 n. 18 New; p. 157 n. 2; 36 Cyc. p. 1140 n. 64.

Original proceeding in mandamus by the State of Wyoming, on the relation of National Life Insurance Company, against Lyle E. Jay, as Insurance Commissioner. Peremptory writ ordered to issue, in absence of answer within specified time.

*William E. Mullen,* of Cheyenne, for plaintiff and relator.

Mandamus will lie to require issuance of receipt for taxes paid in full; Lobban Treas. v. State, 9 Wyo. 385; People v. Keefe, 90 N. Y. 419; McNary v. Wrightman (Ore.) 52 Pac. 510; Perry v. Washburn, 20 Calif. 318; and for revocation of order revoking insurance agent's license, State v. Loucks, 32 Wyo. 26; or to test the validity of other orders by the Insurance Commissioner, L. 1921, Ch. 142; State ex rel. v. Loucks, 30 Wyo. 486. Section 2766 C. S. prescribes the method and rate of taxing insurance premiums. Refunded premiums are not taxable, Op. Atty. Gen. March 29, 1922 and March 12, 1923. The term ''gross

premiums'' as used in the statute means premiums received and retained by the company, German Ins. Co. v. Van Cleave, 191 Ill. 410; State v. Fleming, 70 Neb. 523; People v. Miller, 177 N. Y. 515; State v. Hibernia Ins. Co., 38 La. Ann. 465; Mut. Ben. Co. v. Comm., 107 S. W. 802; Comm. v. Ins. Co. (Pa.) 1 Dauphin Co., 233; Mut. Ben. Co. v. Herold, 198 Fed. 199 (aff'd. 201 Fed. 918). The Wyoming statute contemplates the taxation of premiums received and used by the company. Comm. v. Ins. Co., 252 Pa. 512, 97 Atl. 677; Comm. v. Met. Life Ins. Co., 254 Pa. 510, 98 Atl. 1072; Ins. Co. v. Chaves (N. M.) 153 Pac. 303; Mut. Life v. Henry, 110 Miss., 402, 70 So. 452; State v. Wilson, 102 Kan. 752, 172 Pac. 41; L. R. A. 1918 D 956, and editorial note p. 958; State ex rel. Ins. Co. v. Hyde (Mo.) 241 S. W. 396; Mut. Ben. Co. v. Richardson, 192 Calif. 369, 219 Pac. 1003; Met. Ins. Co. v. State, 194 Ind. 657; People v. Miller (N. Y.) 70 N. E. 10; Ins. Co. v. Styles (1899) 59 L. J. Q. B. 291. The principle is followed in income tax cases. Mut. Ben. Ins. Co. v. Herold, 198 Fed. 199 (aff'd in 201 Fed. 918); Ins. Co. v. Eaton, 218 Fed. 189; Eaton v. Ins. Co., 223 Fed. 1022 (C. C. A.); Ins. Co. v. Lederer, 252 U. S. 523, 64 L. Ed. 698; State v. Hyde (Mo.) 241 S. W. 396; N. W. M. Co. v. Roberts (Calif.) 71 Pac. 313. The cases are all in accord with the above principle, except where qualified by statute or departmental rulings. State v. Tomlinson, 99 O. S. 233; Cochrane v. Ins. Co., 235 Pac. (Colo.) 569; Conn. M. L. Co. v. Treasurer, 31 Mich. 6. A different rule would impose unjust burden upon mutual companies. State v. Wilson (Kan.) 172 Pac. 41. Statutes will be construed, if possible, to accomplish equitable results. Knowlton v. Moore, 178 U. S. 41; Bowers v. Smith, 111 Mo. 45; in re Mitchell, 52 Pac. 800. Statutes imposing a tax are to be construed strictly against the state. Gould v. Gould, 245 U. S. 151, 62 L. Ed. 211.

*William O. Wilson,* Attorney General, and *James A. Greenwood,* Deputy Attorney General, for defendant.

Our legislative history relating to the taxation of insurance premiums should be considered. Ch. 28 L. 1869, p. 345, provided for a tax upon the amount of premiums taken; the Act of 1877 taxed premiums received in excess of losses and expenses; Ch. 15 L. 1897 imposed a tax on gross premiums and is the present law, in effect for more than thirty years, and, until 1921 gross premiums without deduction were taxed under it. This construction was approved by the opinion of the Attorney General given February 16, 1921. A subsequent opinion given on March 29, 1922 by the Attorney General advised that refunded premiums were not taxable, which was approved by another opinion given on April 21, 1927, without defining the term "gross premiums received." The practical construction of statutes on the subject, as shown by our legislative history, supports the principle of taxing gross premiums without deducting refund premiums, sometimes called "dividends." That rule has been followed during forty years of the total period of fifty-six years that insurance premiums have been taxed in this state, and should be persuasive in construing the present statute. 25 R. C. L. Sec. 212; Chesnut v. Shal, 16 Oh. 599; State ex rel. Pitts v. Baseball Club, et al. Ann. Cases 1914 B. 1245; Richardson v. Young, 125 S. W. 686; Kelly v. State, 132 S. W. 193; Brown v. Sullivan, 161 S. W. 50; A. & E. Cases 1917 D. P. 468; 49 Am. Dec. 232; Comm. v. Possey, 2 A. D. 560; Maker v. State, 26 A. D. 379; Bruce v. Schuyler, 46 A. D. 447; Clark v. Mowyer, 5 Mich. 468; 25 B. & Y. Sec. 274, p. 1043; Jacobs v. Prichard, 223 U. S. 200; U. S. v. Mason, 227 U. S. 486; Brown v. Barry, U. S. 1 L. Ed. 364; U. S. etc. Co. v. Sullivan, 128 N. W. 1112. Statutes on the subject may be placed in three classifications: (1) Those expressly prohibiting such deductions; Arkansas, Sec. 9968 Dig. 1921; Colorado, Sec. 2486; Comp. L. 1921 construed in Cochran v. Ins. Company, 235 Pac. 569; Georgia, L.

1923, Act 4, Sec. 7, N. Y. L. Co. v. Wright, 31 Ga. App. 713; Iowa, Sec. 7022 Code 1924; Maryland Code Ch. 492; Michigan does not prohibit but administrative ruling denies deduction; New Hampshire, Ch. 275 L. 1926; Florida, Sec. 911 R. S. 1920 as amended by L. 1925; North Carolina, Ch. 101 L. 1925; the Texas statute is similar to Wyoming but deductions are denied in that state, Art. 4769, Civ. S. 1925; Virginia, Code 1919 p. 3093; Washington, the same Colorado and follows that state, Sec. 7071 R. S. 1922. (2) Statutes expressly providing what deductions may be made: Mississippi, L. 1926 Ch. 110. (3) Some of the foregoing statutes have been construed by commissioners and others by attorneys general of the respective states. Heretofore Wyoming has followed interpretations by the attorney general. In view of the history of our legislation on the subject, and the practical construction thereof, the deductions should be disallowed.

*William E. Mullen,* in reply.

Under the Act of 1869 the tax was collected by counties as a general tax. The Act of 1877 also provided the general property tax on premiums, however, in excess of losses and expenses. The Acts of 1869 and 1877, respectively, provided for an advalorem tax, whereas our present law calls for an excise tax. Our legislative history on the subject is, therefore, not controlling. There is nothing in the pleadings indicating administrative construction of the present law. The demurrer admits all material allegations of the petition. The court will not look to facts not forming part of the pleadings, to sustain the demurrer to the petition. Savings Assn. v. Clause, 13 Wyo. 175. Courts will take judicial knowledge of the rulings and opinions of attorneys general where they have influenced the administration of public business. State ex rel. Burdick v. Schnitger, 17 Wyo. 88. Statutes prohibiting dividend deductions, of course, do not require construction and have no application to the present controversy. The statutes of Colorado

and Washington also differ from Wyoming in terms. Administrative rulings construing statutes in other states should not be considered as authority as to the questions here involved.

BLUME, Chief Justice.

The relator, a mutual life insurance company, duly filed its annual statement of business transacted in the state of Wyoming for the year 1926, and paid $889.51 as a tax at the rate of 2½ per cent on premiums in the sum of $35,-580.21, received on business done in this state during that year. This amount of tax was accepted, but later the Insurance Commissioner of the state demanded a further tax on an additional sum of $17,099.46, and threatened to cancel the license of the relator to do business in this state, unless this additional tax amounting to $427.48 were paid. Thereupon the relator commenced this original proceeding in this court, praying for a peremptory writ of mandamus to compel the Insurance Commissioner to vacate his order demanding such additional tax, and that he issue his receipt showing full payment of taxes due by relator to the state for said year. An alternative writ of mandamus was issued citing the defendant to appear and show cause why the writ should not be made permanent. The defendant appeared and demurred to the petition, alleging that it fails to state facts sufficient to constitute a cause of action, and the case has been argued and submitted thereon.

The facts, as disclosed by the petition, are in brief as follows: Relator is a mutual life insurance corporation organized under the laws of Vermont and duly licensed to transact business in Wyoming. It conducts its business on the mutual plan, and with the purpose to furnish the insured with insurance at cost. Inasmuch, however, as relator has no capital stock, and must rely on the receipt of premium to pay ordinary losses, as well as to meet all unusual contingencies, it must provide for a margin of safety. Hence it fixes the premium payable on the face of the poli-

ices high, with the intent and under the agreement with
the policy holders, that if the amount collected is found
from time to time to be not needed, the latter shall partici-
pate in the benefit thereof.   The policies issued, according-
ly, are known as policies on the participating-plan, and the
premium payable on the face of the policies is but a max-
imum amount of premium and necessary to be paid only
if contingencies should require it.   To provide the margin
of safety above mentioned, relator and other insurers oper-
ating on the same plan, determine the maximum amount
of premium payable on the face of the policies on the fol-
lowing assumptions: first, of a mortality rate higher than
may be expected in actual operation; second, of a rate of
interest on investments lower than may actually be real-
ized; third, of an amount for expenses and contingencies
greater than that which may actually be needed.   Accumu-
lations by reason of these factors, namely money saved and
not expended on account of a lower mortality, and money
gained because of more interest received, and because of
less expense for operation and contingencies, than above
calculated, constitute and are put into what is called a divis-
ible surplus or dividend fund, the amount of which is deter-
mined and fixed at the end of each year, and is paid back
to the policy holders in one of the ways stated in the poli-
cies, namely, (a) in cash, or (b) applied toward the pay-
ment of any premium, or (c) converted at net single, pre-
mium rates into additional paid-up participating insur-
ance, which may be surrendered for its cash value at any
time, or (d) deposited with the company subject to the pay-
ment annually of three per cent interest thereon.   The ag-
gregate maximum amount of premiums specified in the
policies of insurance of the relator, held by residents of
the state of Wyoming, payable for the year 1926, was the
gross sum of $52,679.67, which was paid as follows:
$9,057.01 by the application of dividends, pursuant to re-
quests of policy holders, as part-payment of premiums due;
$8,042.45 by the payment of cash dividends to policy hold-

ers out of the divisible surplus; $35,580.21 by cash paid by policy holders to the company and retained by it. The tax specified in the statute was paid on the last sum, namely on $35,580.21, but the Insurance Commissioner also claims a tax on the sums of $9,057.01 and $8,042.45 returned to the policy holders either in cash or by application, as part payment, on the premiums specified on the face of the policies of the respective policy holders. The provisions of section 2766, W. C. S. 1920, in so far as material here, are as follows:

"There is hereby imposed and levied upon each and every insurance company transacting the business of insurance within this state, a tax of 2½ per centum per annum upon the gross premiums received by it for insurance within this state from the beginning until the close of the calendar year."

The point in dispute is as to whether or not the amounts paid in 1926 out of the divisible surplus of relator to its policy holders, as cash, or which was applied as a part-payment on the maximum premium specified in their respective policies, should be considered as part of the "gross premium" mentioned in the statute aforesaid. We do not understand that there is any controversy in this case as to so-called dividends paid to policy holders other than those paid to policy holders who actually paid premiums to the company during the year 1926. We think that the contention of the relator as to the meaning of "gross premiums," as used in our statute above quoted, must be sustained, and that the distribution made to policy holders as above mentioned, out of the divisible surplus fund, cannot be considered a part thereof. For it is apparent from what has been said, that this fund does not represent any profits. A dividend therefrom is not a dividend as ordinarily understood. It represents an overpayment previously made by the policy holders and an amount not deemed necessary by the company to be retained in order to meet the expenses

of operation and of contingencies. And inasmuch as the insurance is at cost, the distribution of this amount is not even a matter of favor to, but a matter of right of, the policy holders. They are not bound under their contract to pay the amount of the premium specified on the face of the policy except when necessary for the company to meet its obligations. The premium which they are compelled to pay is the amount specified on the face of the policies less their proportion of the divisible surplus. If one of them has agreed to pay $200 less any overpayment which may be found to have been made by him, and such overpayment is found to be $50, and he pays only $150, the gross premium received from this policy necessarily is only the last sum mentioned, and it is hardly credible that the legislature intended to tax an amount not actually paid or received. That is substantially the situation of the policy holder who exercises the second option above mentioned contained in relator's policies. If instead of paying $150, this same policy holder should pay the full amount of premium specified on the face of his policy, and, exercising the first option specified therein, receives $50 in cash from the company, the result would be the same, though the bookkeeping somewhat different. If A owes B $150, but gives B a check for $200 and receives $50 back in change, the gross amount that A has paid is, practically speaking, but $150 and no more. This is the view that has been taken by nearly all the courts that have had occasion to pass on this question. Mutual Benefit Life Insurance Co. v. Commonwealth, 128 Ky. 174, 107 S. W. 802; Commonwealth v. Penn Mutual Life Insurance Co., 252 Pa. 512, 97 Atl. 677; Commonwealth v. Metropolitan Life Ins. Co., 254 Pa. 510, 98 Atl. 1072; Penn Mutual Life Insurance Co. v. Henry, 110 Miss. 402, 70 So. 452; State v. Wilson, 102 Kans. 752, 172 Pac. 41; L. R. A. 1918 D. 955; State ex rel. National Life Insurance Co. v. Hyde, 292 Mo. 342, 241 S. W. 396; Mutual Benefit Life Insurance Co. v. Richardson, 192 Cal. 369, 219 Pac.

1003; Metropolitan Life Insurance Co. v. State, 194 Ind. 657. And see cases in note L. R. A. 1918 D 958.

The actual situation in this case is well stated in Mutual Benefit Life Insurance Co. v. Harold, 198 Fed. 198, where the court said:

"The true situation, however, is this: The policy is issued at a fixed premium, as determined by the company's. table of rates. That stipulated premium cannot be increased, but may be lessened annually by so much as the experience of the preceding year has determined it to have been greater than the cost of carrying the insurance, and the difference between the amount of the stipulated premium and the cost of carrying the risk constitutes the so-called dividend. This difference, however, is not in any real sense a dividend. The term as used is technical and well understood in insurance circles, and, as so understood,. has a widely different signification from that ordinarily attached to the word 'dividend.' It operates, as already stated, merely to abate or reduce the stipulated premium called for by the contract of insurance, to the extent and. for the reason that it has been determined by experience that the policy holder paid for his insurance during the preceding year more than it actually cost the company to carry the risk. This excess payment represents, not profits. or receipts, but an overpayment; an overpayment because, being entitled to his insurance at cost, and having paid more than it cost, he is equitably entitled to have such excess applied for his benefit. It makes no difference what. this excess is called. The question is, What does it represent? Does it in any wise or to any extent represent earnings or profits received by the company, so as to constitute it a part of its income; or does it merely represent an overpayment?

"Under the terms of his policy, the policy holder may at his option withdraw such excess in cash, and thereby impart to it a quasi appearance of profits; but its character is not thereby changed. In that case, however, he would, if he desired to continue his policy, be required to pay the full premium as therein stipulated; whereas, if he desired such premium reduced to what experience had shown was the actual cost of his insurance, he could have

the excess over such cost applied in reduction of the stip-
ulated premium, and pay only the cost price for the ensu-
ing year; and, assuming that the cost price as determined
by the experience of the first year remained the same for
5, 10, 15, or other number of years, that original excess
payment would serve to carry his insurance at cost during
all of the succeeding years. * * *

"From the foregoing it appears that what the company
receives in cash, and all that it so receives where the divi-
dend is applied in abatement of renewal premiums, is the
difference between the stipulated premium and the so-
called dividend. In such cases the dividends are not sums
paid to the policy holder and by him returned in cash.
They are not 'income * * * received.' The policy holder
has not paid the premium stipulated in his policy, but a
premium reduced by his share of a fund, as ascertained by
the directors, composed of excess premiums.''

Two cases which held contrary hereto have been cited:
State v. Tomlinson, 99 O. S. 233, and Cochrane v. National
Life Ins. Co., 77 Colo. 243, 235 Pac. 569. Both of these
cases turned upon the peculiar and special course of leg-
islation in the respective states. The Ohio court frankly
admits that except for such legislation, it would have held
otherwise. So in the case at bar, it is argued that in view
of the history of the legislation on this subject, and be-
cause of the construction put thereon by the administra-
tive officers of this state, we should not follow the great
weight of authority on this point. We are unable, how-
ever, to see anything in the legislation on this subject
which would lead us to believe that the legislature in-
tended to tax the divisible surplus above mentioned. The
first act on this subject was sec. 15 c. 28, Laws of 1869. By
that act the "premiums taken" in by insurance companies
were required to be listed for taxation the same as other
property, and the amount was liable for an *ad valorem*
tax. The next legislation on the subject is found in the
enactment on insurance by the legislature that met in
1877. By section 37 of that act it was provided that every

insurance company should be taxed "upon the excess of premiums received over losses and ordinary expenses incurred within the territory during the year previous to the year of listing." That act remained in force until 1897, when the law as substantially in effect at the present time was enacted. There is nothing in any of these laws which would indicate that the meaning of "gross premiums received" is other than as we have interpreted these words.

It is argued on behalf of defendant that from 1869 to 1921, the tax assessed against insurance companies was computed and paid upon the entire gross amount of premiums received from business done in this state without reference to any divisible surplus, and that we should adhere to the construction put upon it for so long a time. There are several answers to this contention. In the first place, we are unable to see how the attorney general knows that such construction was put upon the law from 1869 to 1897, for during that time the premiums received by insurance companies in this state were listed, and the taxes thereon were paid, in the various counties of the state. Further, under the law of 1877, expenses and losses of the companies at least were deductible, so that it would probably be difficult to determine what the practice in the various counties was, and we cannot, under these circumstances, at least, take judicial notice thereof. Whether any mutual life insurance companies, such as the relator herein, were doing business in this state during that time may well be doubted; at least we cannot take judicial notice that they did. It may be that the construction put upon the law of 1897 by the administrative officers of this state was, up to 1921, as claimed, but even assuming that we could take judicial notice thereof, which we do not decide, the construction put thereon since 1921 has been different. In that year the then attorney general construed the law as we now construe it, and that ruling has been

adhered to by two of his successors, including the present occupant of that office. Under these circumstances the construction put on the law prior to 1921 could not, we think, be of controlling importance herein.

The demurrer filed herein must accordingly be overruled, and it is so ordered, and unless within 15 days the defendant files an answer herein, the peremptory writ of mandamus will issue as prayed.

Potter, J., and Kimball, J., concur.